**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 05-CR-30137-DRH** |
| | ) | |
| **DAMMARO D. PERKINS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

**HERNDON, District Judge:**

### I. INTRODUCTION

On September 27, 2004, Defendant was released from Pinckneyville Correctional Center and placed on Mandatory Supervised Release ("MSR").[1]  As part of the MSR, Defendant signed an agreement, which contained the following provision: "You shall consent to the search of your person or property, or residence under your control."  Over the course of the next several months, Defendant tested positive for marijuana on several occasions (September 29, 2004; December 14, 2004; March 22, 2005; and June 5, 2005).  Over that same period of time, Defendant consistently

---

[1] What was previously termed "parole" in Illinois law is now termed "mandatory supervied release."  The Court uses the terms synonymously.

informed IDOC that he was not employed.   On July 27, 2005, parole agents conducted a warrantless and non-consensual search of Defendant's residence and recovered crack cocaine, marijuana, a box of plastic bags, a scale, over $1000 in cash, a loaded .38 revolver, and additional ammunition.   Defendant filed a motion to suppress (Doc. 15) all evidence obtained as a result of the warrantless search of his residence on July 27, 2005.   The Government filed a response in opposition. (Doc. 19.)   A hearing was held on the motion to suppress (Doc. 15) on October 17, 2006.   Following the hearing, the Court granted a motion by Defendant to allow supplemental briefing.   (Doc. 20.)   Defendant submitted a supplemental brief in support of his motion to suppress (Doc. 24) and the Government submitted a supplemental brief in opposition (Doc. 27).

## II. FACTS

In the Court's mind, the critical facts of this case center around Defendant's positive drug tests and the information that was conveyed by Defendant's parole officer to the compliance check team.

As stated above, Defendant was released from Pinckneyville Correctional Center on September 27, 2004.   Upon his release, Defendant was placed under the supervision of Illinois Department of Corrections Parole Agent John Wiebler.   Agent Wiebler had previously supervised Defendant.[2]   At the first face-to-face visit following

---

[2] Defendant's prior term of mandatory supervised release, which began on February 18, 2004, was terminated within six weeks because Defendant was arrested and charged with possession of a controlled substance and obstructing justice.   Defendant also tested positive for marijuana under the supervision of Agent Wiebler during that brief release.

Defendant's September 27, 2004 release, Defendant tested positive for marijuana.

Defendant tested positive for marijuana on December 14, 2004, March 22, 2005, and

June 5, 2005.  He also tested positive for cocaine on May 3, 2005.  June 5, 2005 was

the last visit by Agent Wiebler prior to the search of Defendant's home 52 days later

on July 27, 2005.  During the June 5th visit, not only did Defendant test positive for

marijuana, but he also informed Agent Wiebler that he had smoked five "blunts" that

day, two "blunts" the previous day, and three "blunts" the day before that.

Defendant's MSR agreement specifically provided: "You shall refrain from the use or

possession of narcotics or other controlled substances in any form…"

On July 27, 2005, agents from the Illinois Department of Corrections

conducted a "compliance check" at the Defendant's residence.  At the suppression

hearing, Agent Wiebler explained that on the morning of the scheduled compliance

check, parole agents were divided into teams and assigned a group of "parolees"

whom they were to visit and conduct a search of their residences. (Tr. at 33.)  When

agents arrived the morning of the compliance checks, the files of each of the parolees

were separated into three groups and assigned to one of the compliance check teams.

Defendant was not assigned to Agent Wiebler's team. On that particular day, many

of the parolees were under Agent Wiebler's supervision; therefore, he testified that

he went through the stack of files for the other teams and then told members of those

teams who needed to be "looked at."  On direct examination, the Government asked,

"Did you have discussions with those agents about your experience with this

defendant while he had been on supervised release?"  (Tr. at 33, ln. 20-22.) Agent

Wibeler responded, "Yes, I did, sir. I went through all the files and the parolees that I know that test positive for drug use continually. I prioritized them and I moved him to the top of the compliance check." (Tr. at 33-34, ln. 23-25.) When questioned further on cross-examination, Agent Wiebler testified, "I went through the stacks of files and said, *this guy here needs to be looked at, this guy here needs to be looked at*, at the people that were on the individual teams." (Tr. at 41-42.) Agent Wiebler testified that the teams do not always make it through the entire list of parolees, so they have to prioritize the list. (Tr. at 35.)

Agent Wiebler also testified that the standard procedure is to ask consent and then conduct a search, once consent has been granted. (Tr. at 46.) If, however, a parolee refuses consent, Agent Wiebler said that "we would have to call our supervisor and get directions from him on how he wants to handle it." (Tr. at 46, ln. 22-24.)

### III. ANALYSIS

Defendant contends, and the Government agrees, that under Illinois law, the Illinois Department of Corrections ("IDOC") may conduct warrantless searches of the homes of individuals who are on MSR without their consent only if there is reasonable suspicion to support such a search.[3] Following the United States

---

[3] Perhaps the Government was so confident that reasonable suspicion was present that it did not feel the need to argue that reasonable suspicion is no longer required post-***Samson***. If this was the case, the Court finds this to be an extremely risky strategy on the Government's part, particularly given the strong arguments that could be made that individualized suspicion is no longer required post-***Samson***. Conversely, if the Government honestly does believe that reasonable suspicion is required to support searches of parolee's homes, the Court would advise the Government to take a closer look at the searches that are being conducted as part of the

Supreme Court's recent decision in *Samson v. California,* **126 S.Ct. 2193 (2006)**, this Court declines to adopt Defendant's position so readily. Ultimately, the Court need not decide whether reasonable suspicion is still required to conduct a search of a parolee's residence because the Court finds that the search was, in fact, supported by reasonable suspicion. Nevertheless, the Court believes a more thorough discussion of ***Samson*** is warranted.

In determining whether a search is reasonable within the meaning of the Fourth Amendment, the Court begins "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interest." ***Id.* at 2197.** In a series of cases, the United States Supreme Court has held that parolees enjoy a significantly diminished expectation of privacy, due to the salient governmental interest in monitoring parolees. ***See Id.*; *United States v. Knights,* 534 U.S. 112 (2001); *Griffin v. Wisconsin,* 488 U.S. 868 (1987).** The question before the Court in ***Samson*** was whether "a condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment." ***Samson,* 126 S.Ct. at 2196.**

After weighing the interests, the Court in ***Samson*** upheld a suspicionless search of a parolee's person under a California state law, which requires that

"compliance checks." Agent Wiebler testified that these searches were being conducted on all parolees.

parolees agree in writing to be searched with or without cause.  The Court held that the "touchstone of the Fourth Amendment is reasonableness, not individualized suspicion." ***Id.* at 2201.**    This Court reads **Samson** to say that the Fourth Amendment does not *require* individualized suspicion.  However, **Samson** does not preclude other States from requiring some form of individualized suspicion.  "That some States and the Federal Government require a level of individualized suspicion is of little relevance to our determination whether California's supervisory system is drawn to meet its needs and is reasonable...." ***Id.* at 2201.**  The Majority opinion continues on to note that its holding did not give parole agents "unbridled discretion to conduct searches" because California's case law prohibits "arbitrary, capricious or harassing" searches.  ***Id.* at 2202 (citing *People v. Reyes*, 19 Cal. 4th 743, 752 (Cal. 1998)).**  Therefore, this Court must examine Illinois law.

Illinois does not have a statute or regulation that requires individualized suspicion.  Rather, the "reasonable suspicion" requirement is entirely grounded in case law.  ***See People v. Lampitok*, 207 Ill. 2d 231, 252-254 (Ill. 2003) (holding that reasonable suspicion is required to search a probationer's residence).**  However, **Lampitok** was decided prior to **Samson** and involved the search of a probationer's residence, not a parolee.[4]    And the case the Defendant and the

---

[4] While probation and parole have generally been treated the same in terms of **fourth amendment** analysis, the Illinois Supreme Court and the United States Supreme Court have both recognized that "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." ***Samson*, 126 S.Ct. at 2198; see also *People v. Moss*, 217 Ill. 2d 511, 531-32 (Ill. 2005).**

Government rely on, **People v. Wilson, 364 Ill.App.3d 762, 847 N.E.2d 753 (1ˢᵗ Dist., March 29, 2006) (holding that reasonable suspicion is required for the search of the residence of an individual on MSR**), is not an Illinois Supreme Court decision and therefore is not binding upon this Court.  Furthermore, while **Wilson** was decided post-**Samson**, it makes no reference to **Samson** in its discussion of other **fourth amendment** cases decided by the United States Supreme Court. **Id.** at **767-68. But see People v. Moss, 217 Ill. 2d 511, (Ill. 2005) (holding that individualized suspicion was not required for a pat-down search of a parolee**). Unfortunately, the Illinois Supreme Court has not addressed the issue post-**Samson**. However, in the past, the Illinois Supreme Court's holding that individualized suspicion is required to search a parolee's residence has been based on that Court's interpretation of the **fourth amendment to the United States Constitution.**

The Illinois Supreme Court has acknowledged that it "unquestionably has the authority to interpret provisions of our state constitution more broadly than the Unites States Supreme Court interprets similar provisions of the federal constitution." **People v. Krueger, 175 Ill.2d 60, 74 (Ill. 1996).**  However, with few exceptions, the Illinois Supreme Court has held that the Illinois Constitution's search and seizure provision, **Ill. Const. art. I, § 6**, provides the same level of protection as the **fourth amendment**. **People v. Lampitok, 207 Ill.2d 231, 240 (Ill. 2003). See also People v. Tisler, 103 Ill.2d 226, 243 (Ill. 1984) ("After having accepted the pronouncements of the Supreme Court in deciding fourth amendment cases as**

**the appropriate construction of the search and seizure provisions of the Illinois Constitution for so many years, we should not suddenly change course....")** Therefore, it seems unlikely that the Illinois Supreme Court would depart from the United States Supreme Court now.

However, *Samson* involved the search of a parolee's person, not his residence. The *Samson* Court did not specifically address whether its holding extended to the search of a parolee's residence. Defendant argues that this makes *Samson* distinguishable. And, it is true that at least in Illinois, this has been a significant distinction:

> Where the MSR search invades the home, it weighs heavily in the balance that determines whether the search is reasonable and remains a significant, rather than minimal, intrusion on defendant's albeit diminished expectation of privacy. Accordingly, permitting a suspicionless search of defendant's home would offend the significantly protected status of the home, and thus, supports the conclusion that defendant's expectation of privacy is not completely extinguished.

**(internal citations omitted)** *Wilson*, **364 Ill.App.3d at 771 (citing** *Lampitok*, **207 Ill.2d at 252).** *But see United States v. Stuckey*, **2006 U.S. Dist. LEXIS 58173 (S.D.N.Y. August 26, 2006) ("Defendant attempts to distinguish** *Samson* **on the ground that his bedroom was searched – rather than his person – neither the holding nor reasoning in** *Samson* **suggests that this distinction could sufficiently tip the reasonableness balance, if at all, in his favor.")**

In the final analysis, this Court believes that if the issue were before the Illinois Supreme Court, it would most likely hold that a search of a parolee's residence need not be supported by reasonable suspicion.  However, because the Court finds that the parole agents had reasonable suspicion to support the search of Defendant's resident, the Court ultimately does not need to decide the issue.

The Court finds that Agent Wiebler had a reasonable suspicion that Defendant was violating the terms of his MSR agreement and that the search of Defendant's residence was based upon this individualized suspicion. "Reasonable suspicion exists when 'articulable facts which, taken together with the rational inferences from those facts...warrant a reasonably prudent officer' to investigate further." **Lampitok, 207 Ill. 2d at 255 (quoting Maryland v. Buie, 494 U.S. 325, 335 (1990)).**

Agent Wiebler had every reason to believe that Defendant was violating the terms of his MSR agreement: *every single* drug test that Wiebler had conducted on Defendant was *positive*.  It would have been *irrational* for Agent Wiebler to not have suspected that Defendant was using and therefore in possession of controlled substances.  Again, Defendant's MSR agreement explicitly forbade Defendant from using narcotics or any other controlled substance.  On Agent Wiebler's last visit with Defendant, June 5, 2005, Defendant not only tested positive for marijuana, he also admitted to using the drug over the past three days.  The Court is only slightly troubled that 52 days

passed between the last positive drug test and the search.  However, the Court believes that Defendant's multiple positive drug tests had established a clear pattern of drug use, which translated into reasonable suspicion that Defendant was engaged, on an ongoing basis, in prohibited activity.   Where the activity is ongoing, the passage of time is less relevant.  ***See United States v. Lamon*, 930 F.2d 1183, 1888 (7th Cir. 1991).**

It is unclear to the Court exactly what information members of the compliance team had about the Defendant when they went to his residence. However, the Court believes that Agent Wiebler had clearly conveyed to the team his suspicion that Defendant was not in compliance with the terms of his MSR agreement.  From Agent Wiebler's testimony, the Court gleans that it was the practice of the parole agents to alert members of other teams if there was a particular parolee who they suspected was out of compliance.   These parolees received priority, based on their agents' belief that they were engaged in prohibited activity.  Even if the compliance team did not know all of the facts establishing the individualized suspicion of Defendant, the Court agrees with the Government that the information known to Agent Wiebler may properly be imputed to the other agents through the collective knowledge doctrine.  ***See United States v. Nafzger*, 974 F.2d 906, 912-13 (7th Cir. 1992).**

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that the search of Defendant's residence was supported by reasonable suspicion.  Therefore, the motion to suppress (Doc. 15) is **DENIED**; all of the evidence obtained during the search is admissible.  Trial in this matter is set for January 2, 2007.

**IT IS SO ORDERED**.

Signed this 15th day of December, 2006.

/s/        David   RHerndon
**United States District Judge**